VAN LONKHUYZEN *v.* DAILY NEWS CO.

1. LIBEL AND SLANDER—CLERGYMEN—LIBEL PER SE—DIRECTED VERDICT.

Where plaintiff, a clergyman, was coeditor of a church paper, which published an article headed "Playing with Fire," criticizing the attitude of the American press, people, and President towards the European war, and advocating a petition of protest to the President against the "one-sidedness" of the attitude of the American press and people towards the Lusitania sinking, which petition plaintiff, who was not an American citizen, later circulated among the members of his church and others who were of Holland descent, an editorial in defendant newspaper,

based upon said article and conduct of plaintiff, characterizing him as "an interloper, a meddler, and a spreader of distrust, discontent and sedition," was libelous *per se*.[1]

2. SAME—JUSTIFICATION—OPINIONS—QUESTION FOR JURY.

Where defendant admitted the purpose of said libelous language was to hold plaintiff up to scorn and ridicule, it cannot be said that it was justifiable as a matter of law because the facts upon which it was based were published, and were true as a matter of fact; defendant not being satisfied with publishing the facts and allowing its readers to draw their own conclusions.

3. SAME—EVIDENCE—PREJUDICIAL ERROR.

The admission in evidence of the notes exchanged between the United States and Germany regarding the Lusitania incident, which were published in defendant newspaper, was not prejudicial error.

4. SAME—EVIDENCE—DAMAGES.

The refusal of the court to allow witnesses to state what effect the reading of the alleged libel had upon them was error, said testimony being admissible upon the question of damages.

5. SAME—EVIDENCE—OPINION.

Where a witness was asked how the libelous article seemed to make plaintiff feel, the answer was properly excluded as opinion.

6. SAME—EVIDENCE—CLERGYMAN—DAMAGES.

Where defendant's manager was asked if he knew that a public man would be injured more than a private individual, in articles of the kind complained of, his answer was erroneously excluded, it having a bearing upon the question of damages.

Error to Kent; Clement Smith, J., presiding. Submitted June 19, 1916. (Docket No. 106.) Decided March 30, 1917.

Case by John Van Lonkhuyzen against the Daily News Company for libel. Judgment for defendant upon a directed verdict. Plaintiff brings error. Reversed.

[1]On what words uttered concerning clergymen are actionable *per se*, see note in 28 L. R. A. (N. S.) 152.

*Dorr Kuizema* and *Smedley & Linsey,* for appellant.

*Norris, McPherson, Harrington & Waer,* for appellee.

Plaintiff, a minister of the gospel of the Christian Reformed Church in Grand Rapids, sued the defendant, the Daily News Company, for a newspaper libel. Plaintiff was also coeditor of the church organ known as "De Wachter," in which were published articles on church and national life.  In the issue of De Wachter of June 16, 1915, there appeared an article written by the plaintiff, which, translated, is as follows:

"Playing with Fire.

"Playing with fire—that is what the attitude of the American Press toward the war may well be termed. We see this too in Italy what the result is when passions are whipped up and gain the mastery.  There the people do not rule but the government rules, although it be in the form of a constitutional monarchy. That government and thereby the nation was for many years bound by treaty with Germany and Austria.  That nation under that alliance has grown great. It had enjoyed all the advantages.  Just recently had it received a free hand, without right, to claim and take a part of Turkey in Africa.  It mixed, with Germany's support in so doing, a bitter drop in the cup of England and France, both having power and influence in the Mediterranean Sea and on the coast of Africa.  Now, in the hour of danger, she reverses her position.  With a faithlessness rarely found in history, Italy now, in this war of nations, throws her force against her allies who helped to make her great. Where is now the confidence and faith in one another? Moreover, bribed by a nation whose mouth is filled with Germany's violation of treaties, and says, note well, and says that therefore she declared war upon Germany.

"And what is the origin of all this in Italy?  In a great measure, through the same means used here to fire the passions.  The public press in Italy played continually upon the hatred against Austria.  The

government did not desire war. But finally it was obliged to yield before the storm. Otherwise (so constantly was the threat) there would be revolution and barricades erected. It was uttered publicly. It hissed members of the Royal Family publicly on the street. It wished to and should fight, and although Austria yielded nearly all that Italy could by means of a few victories have desired. And the war is on. Thousands shall fall and Italian hotheadedness shall be cooled in blood.

"Well, now, America and the American press should use this experience as a mirror. What the result is when once war passions are become overwhelming. And America with all her varying nationalities may well be doubly careful. Since the Lusitania disaster one can see how among so peaceful a nation as the American the tendency is. What a one-sided presentation, to but express it mildly. What an overwhelming of the government and an assurance to the President that he take strong measures knowing the whole people are behind him, although this last might have an entirely different result. See, thus are wars made. Instead of seeing the matter from both sides and being careful, we arouse ourselves and the people, athough there was in this instance plenty of reason to speak more mildly. What were the people doing on a boat loaded with ammunition sailing under an 'unfriendly flag in the war zone? They could just as well have been sitting on an ammunition wagon on the firing line. Far-reaching recklessness. And they would have us look surprised when everything blows up into the air! And from England, naturally, there is just the self-same treachery as during the Boer war, whereby the wives and children of the Boers were placed before English cannon, to which the Calvanist referred to recently. But to all that we are blind, as also that if England shall accomplish her intentions, hundreds of thousands of women and children in Germany abiding in hopelessness shall die of starvation. About this cruelty which it has not been able to accomplish, but for which it is still striving, naturally nothing is said. Nor do we speak of the brutality that we are not on account of patriotism, but only for a handful of gold manufacturing ammu-

nition and all kinds of war materials by which the war is continued and thousands and yet thousands are killed. Killed by American tools in a war in which America has no concern. For a handful of gold do these American citizens permit themselves to be used as murderers and at the same time with their mouths full of the brotherhood of man!

"And all this because the public is weak and poisoned and permits itself to be more and more aroused by the press. More and more one-sided sympathy is being nurtured, and from it one-sided acts result which mock all so-called neutrality, so that before we know it, we too shall sit in the midst of war.

"It is high time, therefore, that a mighty protest be made against this one-sidedness and this whipping-up of public sentiment to one side. So that something worse may not overcome us.

"Perhaps it would not be bad if such a protest went out from the thousands of descendants of the Holland nation, a nation which up to this time, although lying in the midst of the storm of the peoples engaged in the war, yet through God's goodness knows how to keep itself so wonderfully out of the war. We have a right to speak with the rest."

In the issue of De Wachter of June 30, 1915, appeared a protest or petition to the President. It was drawn up by the plaintiff and another minister of the same church. It is as follows, translated:

"To the President,
"White House,
"Washington, D. C.:
"Remembering your laudable appeal to the people for a day of prayer for the restoration of peace in Europe and a day of humiliation of ourselves before God Almighty that peace may be continued in our own country:

"We, American citizens, believe that America's attitude of late is not entirely in accordance with the noble motive which directed you when you set apart the mentioned day of prayer and humiliation, because:

"Munitions and other instruments of warfare are sold in large quantities to one side of the belligerent nations; the public press is inciting public opinion

of Americans against our fellowmen and spreading feelings of hatred towards a friendly nation; the Lusitania incident—however much we too deplore the loss of so many lives—is issued one-sidedly; besides other questions the fact does not seem to be taken into consideration that English merchantmen are said to be instructed to ram submarines and are rewarded for accomplishing such; that in this way the submarines are prevented from investigating a hostile vessel; that merchantmen also are really used as instruments of warfare; not to say that a Christian nation as America may now allow the plans of the starving of millions of innocents by a nation befriended to us.

"We therefore earnestly ask you to use your power to do everything possible that the feelings of prayer and humiliation set forth by your note of November, 1914, may continue in our nation, that exportation of ammunition and instruments of warfare may be prohibited, the propagation of hostile utterances in public life be restricted, the investigation of the Lusitania incident be all-sided, and the dealing with other nations be done in the spirit of peace.

"We, American citizens of Holland descent, beg to be allowed to submit the above to your consideration. We do so the more freely as descendants of a neutral people.

"Most faithfully and respectfully."

This petition was not signed by plaintiff, but was circulated among the members of the church all over the country and a large number of signatures obtained.

The libel complained of consisted in the following editorial appearing in the News, issue of July 2, 1915, published by the defendant company:

### "Playing with Fire.

" 'The dreadful world-war now waging, with its threat of involving us and with the very unhealthy upgrowth during the past 10 months of aggressive hyphenated Americanism in our own country has emphasized the need that we of this nation *shall become wholly united.* There should be no more hyphe-

nated Americans.   Each American of foreign birth or origin should show his good citizenship by being wholly and without reserve and without divided allegiance an American citizen and nothing else.'

"—portions of an article written by Theodore Roosevelt, the most distinguished of American citizens of Dutch extraction.

"It is to be sincerely and deeply regretted that a number of residents of Grand Rapids, of Holland origin, have signed a protest which is to go to President Wilson criticizing him for the kind of diplomacy he has adopted in dealing with the question of German encroachments upon American commerce.

"They were led into this mares' nest of un-Americanism by the Rev. John Van Lonkhuyzen, pastor of the Alpine Avenue Christian Reformed Church.   The Rev. John Van Lonkhuyzen is not an American citizen.   He has lived in this country only four years and has not yet taken out his first naturalization papers, nor even signified his intention of so doing.

"In other words, hundreds of good American citizens have been led into a grievous error by an alien, who owes no allegiance whatever to the Stars and Stripes.

"All Americans of Holland parentage will be asked to sign the paper to be sent to President Wilson, which will criticize and seek to embarrass him, and which, at the same time, will reflect upon the good sense and the patriotism of the entire Holland branch of our foreign born population.

"The petition or protest or whatever it may be, relates that the president's attitude of late is not entirely in accordance with the motive which directed him when he called for a day to be set apart for prayer.   It asks that the exportation of arms be stopped and that the investigation of the Lusitania incident be all-sided—inferring that the President has been biased.

"The protest rings throughout with dissatisfaction and doubt of President Wilson's motives.

"The whole muss was stirred up by the Rev. Mr. Van Lonkhuyzen in an article published in his church weekly, 'The Wachter,' entitled, 'Playing with Fire.'

195 Mich.—19.

The article deeply criticized the American press, and criticized the American people for announcing that they would stand behind the President in any step he might take, claiming that all the citizens might not stand behind the President.  It stated that public opinion had been poisoned, that one-sided actions have been taken and one-sided policies pursued.  Mr. Van Lonkhuyzen, in closing his incendiary article said:

"'It is highly necessary, therefore, that a powerful protest be brought against this one-sidedness and this stirring up of public opinion towards one side.  We should prevent worse things than these while it is yet in our power.'

"The News was somewhat amazed to find what virtually amounts to sedition in Grand Rapids.  The first thing to do was to investigate the source.  Consequently the News telephoned Mr. Van Lonkhuyzen, to find out his exact status.

" 'Are you an American citizen, a naturalized American?' was asked.

" 'No, I am not an American citizen.  I have never been naturalized,' he replied.

" 'Have you taken out your first naturalization papers?'

" 'No, I have not taken them out yet.'

" 'Do you intend to become a citizen of the United States, and do you intend making application for your first papers?'

" 'Yes, I intend to take out my first papers in the near future.'

" 'How long have you resided in the United States?'

" 'Four years.  If any more inquiries come to your office tell them I intend to become a citizen in the near future.'

"Another alien, much more famous and able than Mr. Van Lonkhuyzen, came over here a short time ago.  His name was Dernburg, and he attempted to do some criticizing of the manner in which our government was being conducted.  It was hinted to him that his presence in this country was undesirable, and he took the hint and departed for foreign shores.

"Evidently all the foreign meddlers did not take advantage of this rather forcible lesson.  Maybe Mr. Van Lonkhuyzen never heard about it, there seems to be so much that he doesn't understand.

"So far as Mr. Van Lonkhuyzen is concerned personally it makes no difference, but the pity of, the thing is that probably thousands of good, loyal Americans of Holland descent are putting themselves into a false light by signing the petitions criticizing our President and doubting the sincerity of his motives.

"The fact that the first organized criticism of President Wilson should emanate from Grand Rapids is no credit to the city.

"We are ashamed of the petitions and we are ashamed of the Rev. Mr. Van Lonkhuyzen, or rather, we are ashamed of the fact that he should live here.

"As he is an alien and nobody knows what fish he has to fry, it would seem that he should be the recipient of one of the famous hints from headquarters such as caused Dr. Dernburg to take his hat and go back home.

"We do not want trouble makers in America, whether they be English, French, Dutch, German or Japanese. The United States is today made up of a citizenry that is standing solidly behind President Wilson in his determination to protect our national honor. The Holland people have stood behind him until this plague of sedition broke out in the vicinity of Alpine avenue a few days ago.

"Those who have signed these protests will be sorry for what they have done. Perhaps many of them signed without thinking. That is the most charitable view of the case to take. If the protests have not been forwarded to the President, they should be thrown into the fire.

"The protest is a reflection upon the patriotism of every man who signs it. There has never been any reason to doubt the loyalty of American citizens of Holland birth. There should never be any reason.

"The Rev. Mr. Van Lonkhuyzen is an interloper, a meddler and a spreader of distrust, discontent and sedition. His protest against the 'one-sidedness' of America's policy of dealing with its foreign affairs should entitle him to an invitation to pack his grip and go back to Europe where he belongs.

"If the petition, or protest, ever does reach the President, the News will make sure that Mr. Wilson will receive it in the full knowledge that it originated

in the brain of a busy-body alien and that it does not represent the opinions of the loyal people of Grand Rapids, be they natives or of Holland birth or extraction."

After the publication of the alleged libel, plaintiff served a notice to retract upon defendant. But the defendant published an article thereupon in its paper headed "No Repentance," in which it stated that it had nothing to retract.

On July 28, 1915, suit for damages was commenced by plaintiff against the defendant. An article was thereupon published by defendant stating that it had been sued by the plaintiff. Thereafter several letters and communications were received by the "People's Column" of the News from certain persons who had read the alleged libel commenting upon the matter and ridiculing the plaintiff.

At the close of all the testimony, counsel for the defendant moved for a directed verdict on the ground that the words used in the article were not libelous *per se;* and that, if the words may be considered as defamatory, upon the facts of the article the words are justified. For those reasons a verdict was directed for the defendant.

The plaintiff alleges as error:

(1) That the court erred in granting defendant's motion for a directed verdict.

(2) That the court erred in the admission and rejection of evidence.

KUHN, C. J. (*after stating the facts*). The language in the editorial which it is particularly urged is libelous is:

"The Rev. Mr. Van Lonkhuyzen is an interloper, a meddler and a spreader of distrust, discontent and sedition."

The learned trial judge held that these words were not libelous *per se*, and further that they were justi-

fied as matter of law by the conduct of the plaintiff. In Webster's International Dictionary "sedition" is defined as:

"A commotion, or the raising of a commotion, in a state, not amounting to an insurrection; conduct tending to treason, but without an overt act; excitement of discontent against the government, or of resistance to lawful authority."

Newell on Slander and Libel (3d Ed.), p. 42, says:

"Everything printed or written which reflects on the character of another and is published without lawful justification or excuse is a libel, whatever the intention may have been.

"* * * And so, too, are all words which hold the plaintiff up to contempt, hatred, scorn or ridicule, and which, by thus engendering an evil opinion of him in the minds of right-thinking men, tend to deprive him of friendly intercourse and society."

See, also, 25 Cyc. p. 253; *Gustin* v. *Evening Press Co.*, 172 Mich. 311 (137 N. W. 674, Am. & Eng. Ann. Cas. 1914D, 95).

Defendant's manager on the stand frankly admitted that to say the words here in question of the plaintiff would hold him up to ridicule and disgrace and that his only defense was that they were true. Any person who by his actions undermines the government and seeks to encourage resistance to lawful authority is an enemy of the State, and right-thinking persons would be fully justified in having contempt for him. The supreme court of Minnesota, in speaking of similar language in the case of *Wilkes* v. *Shields*, 62 Minn. 426 (64 N. W. 921)., said the following:

"As applied to this case, any words published of another, the natural tendency of which is to hold him up to hatred, scorn, contempt, or ridicule, and to beget an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse and society, are libelous, and actionable *per se*. A seditious agitator can be neither a good citizen nor

a fit associate for honorable men. The obvious meaning of the words 'a seditious agitator,' as they would naturally be understood by ordinary men when published in reference to another, is that he is a disturber of the public peace and order, a subverter of just laws, and a bad citizen. The publication of such a charge is clearly libelous, and actionable *per se*. In the pithy language of the learned trial judge: "To say that a person is a dangerous, able, and seditious agitator is to charge him with being a disturber of public tranquility and guilty of acts, by writing, speeches, or otherwise, tending to the breach of public order, all of which is inimical to good society and the highest and best interests of the people. Such acts and conduct, even in this free country, must make the person therewith charged an object of public distrust, reproach, and contumely, and such charges are clearly defamatory.' The actionable quality of the words used in the publication is manifest on its face, and it was not necessary to allege any extrinsic facts and circumstances to show their meaning."

We are of the opinion that it must be said that the language was libelous *per se*, and the trial judge erred in holding otherwise.

Neither are we of the opinion that it can be said as a matter of law under the facts in this case that the libelous language was justifiable. One of the very safeguards of our liberties and institutions, and which has been zealously guarded by the founders of this republic, was the right of its citizens to petition. Whatever may be said of the propriety of a man who is not a citizen of this country, and who has simply expressed a desire to become such, to circulate a petition addressed to the President and have citizens generally sign it, it does not follow that such conduct necessarily justifies his being called a spreader of sedition. It is said that the controversy here involved a political question, rather than a legal one. It is true that political issues were involved upon which the defendant differed from the plaintiff, but it must

also be said that mere differences as to political or international policies do not necessarily justify libelous attack. It might well be said here, as was said by the court in the case of *Press Pub. Co.* v. *Gillette,* 229 Fed. 108, 112 (143 C. C. A. 384, 388) :

"It would involve the prescribing of a novel rule of conduct in this country to hold that, in time of peace, criticism of the policy and conduct of an administration, even though severe, bitter, and vehement, is 'traitorous and treasonable.'"

It is further urged that, because the facts upon which the libel was based were published and were true in fact, the conclusions therefrom were merely opinions of the defendant and would mislead no one. The case of *Simons* v. *Burnham,* 102 Mich. 189 (60 N. W. 476), and cases from other jurisdictions, were cited to sustain this viewpoint. In these cases, however, the facts were stated without any further comments, and it was said that, merely because the truth as stated was liable to suggest damaging inferences, it did not make the statements libelous. In *Simons* v. *Burnham, supra,* the court said:

"There is nothing better settled in this State than the proposition that the truth of the publication is a complete defense to the action of libel. Here, then, the defendant has simply told the truth without comment of any kind. Shall we say that, because of the inferences which naturally follow, the meaning of the language should be extended to include the inferences? If so, it logically follows that the truth of the publication is not a complete defense in cases where inferences naturally follow the statement of certain facts. Would the character of the publication depend upon the expectation by defendant that the inference would be drawn? And would the failure of the person addressed to draw the inference relieve the defendant from liability? We get into deep water when we depart from the rule that actions for slander and libel do not lie upon inferences."

In the case before us, the publishers were not satisfied to state the facts and allow the readers to draw their own conclusions, but followed it up by making the libelous statement for the very purpose, as admitted, to hold him up to scorn and ridicule. While the question of whether or not the limits of fair criticism have been transcended may sometimes be a question of law, ordinarily it is a question of fact for the jury, and we are satisfied that under all the facts and circumstances of this case the question of justification became one of fact for the jury to determine.

As the case will be sent back for a new trial, we will now consider various rulings of the court on the admission and rejection of testimony. There were published in the paper the notes exchanged between the United States and Germany regarding the Lusitania incident. They were admitted by the court as showing the basis upon which the editorial comments of the defendant were founded. We see no prejudicial error in the admission of these exhibits.

The trial court refused to allow several witnesses to state what effect reading the article in question had upon them. In this we think the court erred, because the testimony was admissible as bearing upon the question of damages. The rule is thus stated in 25 Cyc. p. 505:

"It is competent for plaintiff to prove by persons who read or heard of the libel the effect thereby produced upon them for the purpose of showing the substantive fact of damages sustained."

Witness Kate Van Lonkhuyzen was not permitted to answer the following question: "How did those seem to make him feel?" The answer was properly excluded, as it would be simply the opinion of the witness.

Mr. Johnson, the manager of the defendant corporation, was asked the question:

"And you knew that a public man would be injured more than a private individual in articles of this kind, didn't you?"

The answer was excluded. We think that the answer should have been permitted as bearing upon the question of damages, because the injury to a man in public life who was held up to public disgrace and ridicule might be greater than to a private individual.

We have examined the other errors complained of, and find them without merit.

The judgment of the trial court must be reversed, and a new trial granted, with costs to the plaintiff.

STONE, OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred. PERSON, J., took no part in this decision.